Good morning, Your Honor. If it may please the Court, my name is Nick Pallavita for the Appellant. And the argument that we have before this Court in the issue that we have is who owns the corporate overrides from a corporate contract signed by Mr. Zimbelman's client, Mr. Farrington. With that, if we turn the Court's attention to the contract itself that Mr. Pfeifferlich signed, which is actually in the appellee's brief on page 22, you'll notice that the title of that is PFP Plan Administrators, which is another name for the 412i company, another name for Bellingham Insurance Agency. It was the predecessor corporation. I'm not sure if this is the contract. This is the 02 contract? Yes, that was the 02 contract. That was the first contract signed when Mr. Pfeifferlich was the corporate agent. I thought there was another contract for 2003. Yes, Your Honor. It appears on page 21 of the appellee's brief. You'll notice that was the second corporate contract signed by... Is there excerpt of record 286? Have I got the right document? I believe so. It'll be in the appellee's brief on page 21. It's actually... I just have the portions of the records. I don't have the appellee's brief. And it will actually say PFP Plan Administrators slash Charles Farrington. My question for you was, I thought in my study of this case, there was some question as to whether or not the PFP Plan Administrators slash Charles P. Farrington was added at some point after the contract was signed. No, Your Honor. It was not. As a matter of fact, Lafayette... There was never a dispute over that? To my knowledge, there was never a dispute over that. If you look at that, that was Mr. Farrington's own signature. And Lafayette would not issue checks unless PFP's name was on it. Was there another document where that question was raised? There was another document that was... that's actually a predecessor document to that, which I can give to you. No, I just... if it's not relevant, I don't want to waste your time. It's not relevant. No, it's not relevant. You've answered my question. The issue is, is that contract a corporate contract or is that Mr. Farrington's contract? Now, we argue that that is a corporate contract. Why? Because it says the name PFP Plan Administrators. Why? It's because Mr. Farrington was a corporate officer. Counsel, let me ask you the collateral estoppel or res judicata issue. I mean, you made this argument to both the arbitrator and to the bankruptcy judge, both of whom have now ruled against you. Yes. By what authority do we remand it for yet a third determination by the bankruptcy judge? Because if you looked at the arbitration award very carefully, same with Lafayette, looked at it also, it says specifically the Lafayette Annuity Commissions that were from policies written in his name go to Farrington. And those were already paid. The overrides are what we're arguing. You're arguing the merits. I'm raising a legal question. Yes. How can we even get back into this if the arbitrator ruled contrary to your position and that judgment is final because there was no appeal taken from the Whatcom County Superior Court entry of judgment confirming the award? Good question, Your Honor. I mean, what are we doing here? Good question, Your Honor. You'll notice that the Lafayette overrides, because these are funds that actually go to the corporation from policies written by other agents. I know you're calling them overrides. Yes. They're referred to as commissions elsewhere. It's the same pot of money. We're talking about $70,000. No, it isn't the same pot of money. And this is where Mr. Zillman had confused the lower court. Well, then the upper court is confused as well because I thought we were talking about the same fund. No, it's not the same pot of money. When an insurance company pays funds in a brokerage general agent contract, part of the funds go to the writing agent for policies written in his name. The other part is override that goes to the corporation to maintain the staff for the agents. Now, this is clearly delineated in ERISA Section 103C. Let me ask you this. Yes. The money that we're talking about, whatever you want to call it, is money that at one point was in the custody of the trustee, correct, in a bank account that the trustee in bankruptcy controlled? It was, and that was the first time that the Lafayette overrides were decided. The arbitration award dealt with the American national contract and the Lafayette policy. But at some point there was an award entered. I think it was by the bankruptcy court, was it not, an order that directed the trustee to pay those funds over to Mr. Farrington? That is correct. That is correct. And we're saying that the judge erred in the fact that he did not take into consideration that Mr. Farrington was a corporate officer, had a duty to the corporation, and cannot just sneak a contract into his own name or make an appearance that he can. Now, if he was not a corporate officer. Was there a noncompetitive provision in the contract? Yes, Your Honor. As a matter of fact, there was a covenant not to compete, and you'll notice that in the Excerpt to Record 4, page 46, that Mr. Farrington had signed. It was limited, wasn't it? Pardon? It was limited to some specific item. It was limited saying that he could not write contracts into his own name. And remember, now this is the important part of it, Mr. Farrington wasn't an agent. He was a corporate officer. Now, the question I have before this court has never been addressed. Can a corporate officer in a brokerage general agent contract take a corporate contract and flip it into his own name and take all the proceeding and put it in his pocket? If the answer is yes, he can do that, we need to know about that. If the answer is no, he can't because he's a corporate officer and has a duty of loyalty, as this court has said. I thought there was testimony in the record apparently credited by the fact finder, the arbitrator, that Mr. Farrington had been assured that he could get some extra compensation by receiving some of this money. Yes, and if you looked at that, Mr. Zimbelman also put it in his brief. It was for annuity written in his name, and then he said it may be salary. He was very unclear and vague about whether or not he could receive any of those funds. The documentation says specifically that any corporate overrides, and he signed a covenant not to compete, go to the corporation. I didn't have the authority as the chief executive officer. He didn't have the authority as the treasurer of the corporation to all of a sudden switch the contract in his own name and take the funds out. None of us had the authority. This was not argued at the arbitration level, and this is clear if you look at the record, and it's also in my brief. But I'm still having a hard time. I mean, okay, now you've come up with new arguments that you say were never argued to the arbitrator. The Lafayette override commissions were never argued, yes. But the arbitrator seemed to think that this money was part of the arbitration, and that judgment has now been confirmed in an award. Aren't you too late to be raising these arguments? No, he didn't, because if you look at the award, the word says specifically, Lafayette annuity commissions. Mr. Farrington is titled to policies written in his name. This is not an insurance policy. This is the corporate contract from policies written in seven other agents' names. Farrington didn't write any of these policies. He didn't do any of this work. Then what happens? The overrides go to the corporation to maintain the secretaries, the rent, and the staff. And now what he's saying, hey, wait a minute. Since I signed this corporate contract, I want these to be mine. This issue was never argued in arbitration, and even there is a correspondence between Mr. Zumbleman and the arbitrator where the arbitrator said, why wasn't this brought up? It wasn't even pled. And Mr. Zumbleman says, well, I just forgot to pled it. Okay, I just wanted to know what I was looking at. What they were looking at was one annuity policy from Lafayette that Mr. Farrington actually did write in his name, and that was the only thing to sign the arbitration. It wasn't all the policies. Counsel, sorry to interrupt. You've got about two minutes left. Did you want to make a rebuttal argument? Yes, Your Honor. I'll reserve my time for rebuttal at this point in time. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court to adjust this if I can. Good morning again. My name is Eric Zumbleman, and I represent the appellee, Charles P. Farrington. I stand before the Court really in the position of the trustee in the sense that this was the trustee's motion initially and was granted. It was obviously something we were in favor of because the commissions at issue belonged to my client. Well, you call them commissions. He calls them corporate overrides. Are we still talking about the same money? Same thing. There's no difference, and neither the arbitrator nor the bankruptcy judge nor the bankruptcy appellate panel found any difference, any distinction. And Mr. Pallaveda's effort to persuade the Court that there is a difference is really unsupported by the record. There is one contract, as the BAP noted, and that contract says that Mr. Farrington is, as an individual, the agent that is entitled to be paid. And, in fact, Judge Glover ---- He's the only one who has a license, right? He's the only one who has a license. How do you reconcile that with the noncompetitive covenant? Well, there's two issues. One, I don't believe that that's what the noncompete says. Two, Mr. Pallaveda himself promised Mr. Farrington that he could keep those commissions. That wasn't part of their deal. He asked my client to become the agent for the company. Three, the contract itself is very clear in that regard. Four, the agent before and the agent after assigned their commissions to the company, whereas my client did not. So, and five, this was never raised anywhere, not before the arbitrator, not in the Whatcom County Superior Court before and after the arbitration. And it really wasn't even discussed in the district court, excuse me, in the bankruptcy court. So the answer is I'm not even sure that's an issue before this court. Okay. I would like to answer Judge Tallman's. You mentioned a dispute about on Mr. Farrington's contract. There is, in fact, a dispute about that. Mr. Farrington stated in a declaration that he submitted to the bankruptcy court at page 440 of the record, his declaration, paragraph 13, in reference to the signature line and someone having written the name PFP, Planned Ministers, Inc. slash Charles P. Farrington. He states, this is not my handwriting. This was instead written after the fact and without my knowledge or authorization by an employee of PFP. And is that the document that I was talking about? That's the document. That's the ER-286, which is the contract purportedly dated 5-30-2003. That is correct. That contract is dated 5-30-2003 by Mr. Farrington, signed and checked as an individual. And that's replicated in our brief as well. So Farrington's testimony by declaration is that's not my handwriting. That's correct. And that wasn't there when I signed the contract. That's correct. And, of course, that issue never came up at the arbitration. As I think you noted, Your Honor, that the ownership of commissions was an issue at the arbitration. It was expressly discussed. Mr. Palladato referenced the period at the arbitration in the transcript, and it's also in our brief, when that was discussed. Excuse me, counsel. Marshall, would you see that that cell phone is removed from the courtroom, please? Well, why don't you surrender it to the court security officer, and he'll return it to you after the hearing. Go ahead. Thank you. We'll give you a little extra time because your clock was run down by cell phone. No problem at all, Your Honor. I think what I was – I think I lost my train of thought. At the arbitration, the commissions were clearly an issue. It reflected in the fact that the arbitrators awarded the commissions to my client. That's in and of itself. But it's also important to know that the commissions were the thing that started the lawsuit, the litigation between my client and his law partner, Mr. Hess, and the predecessor entity, PFP, Planned Administrators. The initial action in the Whatcom court was a complaint, followed by an emergency motion and a request for some kind of relatively unspecified emergency relief, I guess in the nature of a preliminary injunction or temporary restraining order or even perhaps a writ of attachment, seeking Lafayette commissions because they said, and this was Mrs. Ewing's declaration, which was submitted to the arbitration as Exhibit 84, and it said they're trying to get these Lafayette commissions. You've got to stop them. This was the beginning of the case. And now here we are at the end of the case. This thing has obviously been going on since 2003. It's the same issue. It's the same commissions, although the commissions continued to accrue over the course of the year, so the number became larger by the time it was finally ordered released to my client. But it's the same money. It's always been there. It's always been the issue. If Mr. Pallaveda had more creative arguments to make about why these commissions are owing to him, they should have been made to the arbitrator. That's the basis of the issue preclusion contention that we make, that the bankruptcy court make, that the bankruptcy appellate panel make. I mean, you've got to make your arguments when you've got a chance. You didn't. The issue was decided. It's over. And even if, even if the issue could be re-litigated over and over and over, Judge Glover made a finding in our favor on this question after receiving oodles of materials, arbitration transcripts, the statement from the trustee that he had reviewed all of the transcripts and had concluded that the commissions belonged to my client, and all of the other materials that are listed in the bankruptcy court order, and ruled on the merits in our favor, the bankruptcy appellate panel found as well that the issue had been decided, and even if it hadn't, Judge Glover's ruling was certainly reasonable. And we're here today, and I think Mr. Palladato wants this court to conclude that somehow all of these previous tribunals were wrong, factually. And that's very difficult to do in an appellate setting, and I certainly am no highly experienced appellate attorney, but I know that much. If you're arguing that the facts were reviewed incorrectly, you've got a tough case. And in my view, my clients made every effort to demonstrate this at every level, and it's been successful at every level. I would really open it up to the court for any questions, because I'd like to try to answer in the time I have any other questions the court might have. Okay, well, Judge Tillman, Judge Beazer. I will relinquish the rest of my time then. That's fine, thank you. Thank you very much. I have no questions. Okay, Mr. Bellaveda. Thank you, Your Honor. First of all, factually, there is a big difference between overrides and agent-level commissions. You can ask any five-year CLU, CHFC, the overrides are paid out to the management company and the agent's commissions are paid out to the agent. It's also delineated in ERISA 103C, and these were ERISA plans. The management overrides are not reported on the Schedule A. The agent's commissions are reported on the Schedule A. How do you respond to Mr. Zimbelman's argument that these overrides or commissions, that this money was what precipitated the dispute in the first place, and according to him, was what caused the dispute to get into arbitration in the court? Absolutely not true. As a matter of fact, what the dispute was before the arbitrator was a diversion of an American National Life Insurance check of $145,000. It had nothing to do with the Lafayette annuity. It was only even mentioned because Mr. Farrington had written one policy in his name in Mr. Zimbelman's brief. If you look at the transcript from the case on page 132, Mr. Farrington himself says, I guess cautious, we're not going to do anything about it. I've really not demanded that money. He says so right in the arbitration. I have not really demanded that money. Then Mr. Easter goes, the arbitrator, why not? Well, I have through Mr. Zimbelman. So all of a sudden I didn't remember. We never argued this. These are management overrides from agents that wrote through what we believed was the management contract. Now, why did we think this was a management contract, not Mr. Farrington? Because the checks were coming from Lafayette to the corporation. The direct deposits were coming from Lafayette to the corporation, and until they won the arbitration award, until they impaneled their correct arbitrator, who happened to be, unfortunately, the attorney for one of our defendants, they didn't even bring this issue up. So it was never pled. There was no discovery on this. It was even stated that this was not before the arbitrator. And then when the arbitrator mentioned his award, if you read it, it says, we're going to award policies written in his name. We're not going to award the Lafayette commissions because Lafayette isn't a party to this case. Mr. Pavlin, I'm sorry to say your time is up. You're about 30 seconds over. Oh, thank you. Bring your argument to a close within the minute. Okay. Our argument is quite simple. Is there a duty of loyalty to a corporation? Does a corporate officer have a duty of loyalty, or is the answer no? My reading of the case law and this circuit says yes in the Rodriguez case, but if the answer is no, we need to know about that duty of loyalty, because Mr. Farrington was an officer of the corporation. Thank you, Your Honor. Thank you very much. The case is nicely argued by both sides, and it makes me want to visit Bellingham again. Thanks for coming to visit. That will conclude that argument. The Bellingham Insurance Agency v. Parkinson case shall be submitted in the panel of adjournance. Thank you. All rise.
judges: Beezer, Gould, Tallman